**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————

**No. 21-4559**

————————

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

EUGENE REID LINVILLE,

        Defendant – Appellant.

————————

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. William L. Osteen, Jr., District Judge. **(**1:21−cr−00006−WO-1**)**

————————

Argued: December 9, 2022               Decided: February 24, 2023

————————

Before RICHARDSON, QUATTLEBAUM, and HEYTENS, Circuit Judges.

————————

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Richardson and Judge Heytens joined.

————————

**ARGUED:** Kathleen Ann Gleason, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greensboro, North Carolina, for Appellant. Julie Carol Niemeier, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee. **ON BRIEF:** Louis C. Allen, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greensboro, North Carolina, for Appellant. Sandra J. Hairston, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.

————————

QUATTLEBAUM, Circuit Judge:

Normally, one seeking the Fifth Amendment's protection against self-incrimination must invoke the right and remain silent rather than answering questions that might lead to incriminating evidence. But when a criminal defendant faces what the law calls a "classic penalty situation," the Fifth Amendment's rights are self-executing—meaning they apply whether or not expressly invoked. *Minnesota v. Murphy*, 465 U.S. 420, 435 (1984). A classic penalty situation exists when invoking the Fifth Amendment presents a "nearly certain" risk of criminal penalty. *United States v. Lara*, 850 F.3d 686, 692 (4th Cir. 2017). In a classic penalty situation, statements and other evidence obtained in response to questions may be excluded under the Fifth Amendment even if it was not invoked. *Id.* In this appeal, we consider whether a standard condition of supervised release that requires truthful answers to all questions from probation creates a penalty situation when a probation officer asks a defendant on supervised release questions that, if answered, might incriminate him or lead to incriminating evidence.

While on supervised release for a child pornography conviction, Eugene Reid Linville submitted to polygraph testing. During his polygraph exam, Linville admitted to possessing adult pornography. In addition, his answers to other questions indicated possible deception. After the exam, Linville's probation officer asked him if he possessed child pornography. Linville admitted he did. Then, after he and the probation officer travelled to Linville's home, he turned the adult and child pornography over to probation. In addition to petitioning for the revocation of his supervised release, the government

2

charged Linville with possession of child pornography. In that new child pornography proceeding, Linville moved to suppress his statement to his probation officer admitting that he possessed child pornography and the child pornography was at his home. He argued that the condition of his supervised release that he truthfully answer questions from his probation officer placed him in a classic penalty situation, in violation of his Fifth Amendment right to remain silent. According to Linville, a reasonable person in his situation would have believed that, had he invoked his Fifth Amendment rights in response to probation's questions, his supervised release would have been revoked. The district court denied his motion. And following Linville's conditional plea and sentencing, he makes the same penalty situation argument to us on appeal.

But the special condition did not indicate invoking the Fifth Amendment would lead to the revocation of Linville's supervised release. Nor did Linville demonstrate a reasonable belief that he would be punished for invoking his Fifth Amendment rights. Thus, Linville's supervised release condition that he truthfully answer all questions from his probation officer did not place him in a penalty situation. So, we affirm.

## I.

In 2013, Linville pled guilty to receiving child pornography in violation of 18 U.S.C. § 2252(a)(2) and (b)(1). J.A. 168. He was sentenced to 78 months in prison, followed by ten years of supervised release. J.A. 168. A standard condition of his release required Linville to truthfully answer questions from his probation officer. J.A. 38. The special conditions of his supervised release required Linville to participate in a sex offender

3

treatment program and submit to polygraph testing. J.A. 38. They also subjected Linville to warrantless searches upon reasonable suspicion of unlawful conduct or a violation of supervised release and prohibited him from viewing, purchasing, possessing or controlling any sexually explicit materials. J.A. 39.

After completing his prison term, Linville began his supervised release. He moved to his mother's home in Winston-Salem, North Carolina, where he was placed under the supervision of United States Probation Officer James Long. J.A. 36–37. Over the course of Linville's first year of supervision, Long met with Linville approximately thirty times. J.A. 40–41. During most of those face-to-face meetings, Long asked Linville if he had viewed or possessed pornography. Linville denied doing so. J.A. 157. Linville also participated in a sex offender treatment program in Winston-Salem. J.A. 156.

At the end of his first year of supervision, Long scheduled a polygraph examination for Linville at the probation office. J.A. 42. Eddie Lane, a certified polygraph examiner, conducted the exam. As was standard practice, Linville first answered questions about his sexual history from a written questionnaire. Lane then used the questionnaire in conducting the exam. J.A. 36, 42–43.

During the exam, Lane asked Linville if he possessed any pornography. J.A. 43. Consistent with his written answers, Linville admitted that he had a collection of Playboy magazines that belonged to his father. J.A. 43. When asked whether he had purchased, possessed or viewed pornography, Linville's answer on the polygraph indicated possible deception. J.A. 44, 51.

4

After learning about Linville's possible deception, Long asked him, without providing *Miranda*[1] warnings, if he possessed adult pornography. Linville admitted that he did. J.A. 44. Long then asked if he possessed child pornography. Linville admitted to this as well. J.A. 44. He said the pornography was at his home.

Long told Linville that he would need to obtain the pornographic material. Linville did not object. J.A. 45. When they reached Linville's home, he led Long to the basement where Linville retrieved 8 to 10 cardboard boxes containing numerous magazines, photos and video tapes, as well as notebook-type binders containing compact discs and digital video discs. J.A. 46–47. Linville identified the box that contained child pornography. J.A. 46, 52.

The North Carolina State Bureau of Investigation later reviewed the CDs and DVDs found at Linville's home. It discovered numerous files containing adult pornography and 415 images and 1,352 videos depicting children—including infants, toddlers, prepubescent and pubescent minors—engaged in sexual acts. J.A. 164–65.

The United States Probation Office petitioned for revocation of Linville's supervised release. J.A. 156. The district court found Linville had violated the requirements of his supervised release that he not possess adult or child pornography and scheduled a hearing for his revocation sentencing. J.A. 114.

---

[1] *Miranda v. Arizona* requires law enforcement officers to advise an accused person subject to custodial interrogation that he retains "the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. 436, 444 (1966).

In the meantime, the grand jury returned a single-count indictment charging Linville with knowingly possessing child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). J.A. 6–8. In that criminal proceeding, Linville moved to suppress his statement to Long that he possessed child pornography along with the evidence obtained from Linville's home as a result of that statement. Linville argued that the government obtained the statement and the evidence in violation of his rights under the Fifth Amendment because Linville was required, under the terms of his supervised release, to answer probation's questions truthfully. J.A. 9–14. According to Linville, this placed him in "the classic penalty situation" because it forced him to choose "between refusing to answer the [probation] officer's question and risk revocation of his supervision, or answering and risk criminal prosecution[]." J.A. 11. The government opposed the motion, arguing that Linville's admissions to Long were voluntary, despite the conditions of supervision, because Linville was never threatened with a loss of his liberty if he invoked his right to remain silent. J.A. 15–23.[2]

The district court held a hearing on Linville's motion to suppress. J.A. 30. At the hearing, Long testified about the polygraph exam, Linville's admission that he possessed child pornography and the retrieval of contraband from Linville's residence. J.A. 32–53. Linville did not testify or offer other evidence. J.A. 53. Following arguments by both parties, the district court denied Linville's motion from the bench. It found Long credible

---

[2] In addition, the government argued that even if the statements were not voluntary, the evidence was still admissible under the inevitable discovery doctrine. J.A. 23–29. But we need not reach this issue because, as set forth below, we conclude that Linville did not face a penalty situation.

and placed "great weight" on his testimony. J.A. 73–74. The court found that Long did not threaten Linville with a revocation of his supervised release if he refused to answer Long's questions. J.A. 76–77. And, citing to the Supreme Court's case of *Murphy*, and our decisions in *Lara* and *United States v. Riley*, 920 F.3d. 200 (4th Cir. 2019), the district court held that "the unwarned admissions made by Linville to Mr. Long [did not] violat[e] Mr. Linville's rights under the self-incrimination clause of the Fifth Amendment." J.A. 76–77.[3]

Following the district court's denial of the motion to suppress, Linville entered a conditional plea of guilty to the child pornography offense. J.A. 80–93; 99–100; 110–11. The district court sentenced Linville to the statutory minimum sentence of 120 months of imprisonment, followed by 15 years of supervised release and an 18 U.S.C. § 2259A assessment of $1,000 in addition to a $100 mandatory special assessment. J.A. 132, 148–49. On the revocation of supervised release in the 2013 case, the district court imposed a consecutive sentence of 60 days imprisonment with no further supervised release. J.A. 132. This appeal followed.[4]

---

[3] The district court also held that Linville was neither in custody nor were the circumstances sufficiently coercive to require *Miranda* warnings. J.A. 76–77. Linville has not appealed this aspect of the court's decision.

[4] We have jurisdiction under 28 U.S.C. § 1291.

II.

On appeal, Linville argues that the district court erred in denying his motion to suppress. Basically repeating his position before the district court, he contends that his admission was not voluntary because he was faced with a penalty situation—if he declined to answer his probation officer's question on grounds that the answer would incriminate him, he would be violating the condition of his supervised release requiring him to "answer truthfully all inquiries of the probation officer." Op. Br. 13; J.A. 38. If he answered truthfully, he would incriminate himself and become subject to a new criminal prosecution.

In assessing a district court's decision on a motion to suppress, we review the court's factual findings for clear error and its legal determinations de novo. *See United States v. Lewis*, 606 F.3d 193, 197 (4th Cir. 2010); *see also Lara*, 850 F.3d at 690 ("[W]e review de novo the issue of whether the government violated a defendant's Fifth Amendment right against compelled self-incrimination."). In undertaking this review, "we must construe the evidence in the light most favorable to the prevailing party, and give due weight to inferences drawn from those facts by resident judges and law enforcement officers." *Lewis*, 606 F.3d at 197 (citation omitted).

A.

We begin with *Minnesota v. Murphy,* where the Supreme Court provided the constitutional context and the required framework for our analysis of Linville's arguments. There, the Court explained that the Fifth Amendment's guarantee that no person "shall be compelled in any criminal case to be a witness against himself" not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant; it also

8

"privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Murphy*, 465 U.S. at 426 (citation omitted). Importantly, "[a] defendant does not lose this protection by reason of his conviction of a crime; notwithstanding that a defendant is imprisoned or on probation at the time he makes incriminating statements, if those statements are compelled[,] they are inadmissible in a subsequent trial . . . ." *Id.*

Generally, an individual must invoke his Fifth Amendment right to seek its protection. *Id.* at 429. To invoke the Fifth Amendment privilege against self-incrimination, a defendant "ordinarily must assert the privilege rather than answer if he desires not to incriminate himself." *Id.* Thus, if the defendant voluntarily "chooses to answer," that answer is not privileged. *Id.* There are exceptions, however, to this general rule. *Id.* at 429–41. The exception relevant to this appeal is called the "penalty exception." *See id.* at 434, 439.

The penalty exception applies if the government, "either expressly or by implication, asserts that invocation of the privilege would lead to" punishment, here the revocation of supervised release. *Id.* a 435. In this "classic penalty situation, the failure to assert the privilege would be excused, and the [defendant's] answers would be deemed compelled and inadmissible in a criminal prosecution." *Id.*

*Murphy* involved questions from a probation officer to a probationer, who was required to meet with his probation officer and be truthful with the officer "in all matters." *Id.* at 422. During one meeting, Murphy admitted to committing an unrelated rape and murder. *Id.* at 423. The probation officer reported the confession to police, who arrested

9

Murphy and charged him with murder. *Id.* at 424. Murphy then sought to suppress his statements, claiming that the threat that the government would revoke his probation if he invoked his Fifth Amendment right to remain silent triggered the penalty exception. *Id.* at 425.

The Court provided the framework for considering Murphy's penalty exception argument. In order to determine whether a probationer is subject to a penalty situation, courts "must inquire whether [his] probation conditions merely required him to appear and give testimony about matters relevant to his probationary status or whether they went farther" by taking "the extra, impermissible step" of requiring him "to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent." *Id.* at 436. If the government "expressly or by implication [] asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." *Id.* at 435.

Under that framework, the Court determined that Murphy's murder admission was not the product of a penalty situation. It reasoned the conditions of Murphy's probation only required truthfulness; they did not suggest that his probation would be revoked if he invoked his Fifth Amendment right. *Id.* at 436. Further, Murphy was not told that an assertion of the privilege would result in a penalty. *Id.* at 438. And there was no evidence in the record that Murphy confessed to the murder because he feared his probation would be revoked if he remained silent. *Id.* at 437. Last, the Court added that, since the

10

government could not constitutionally threaten to revoke probation in response to the exercise of the Fifth Amendment right to remain silent, "Murphy could not reasonably have feared that the assertion of the privilege would have led to revocation." *Id*. at 439.

Fairly read, *Murphy* provides a two-step inquiry for courts considering classic penalty situation arguments in the context of supervised release conditions. First, do the conditions actually require a choice between asserting the Fifth Amendment and revocation of supervised release? Second, even if they do not, is there a reasonable basis for a defendant to believe they do?

B.

Following *Murphy*, we agree with the district court that the supervised release condition requiring Linville to answer questions from probation truthfully did not place him in a penalty situation.

First, as in *Murphy*, the condition to Linville's supervised release does not actually require a choice between revocation and asserting the privilege. More specifically, it does not expressly state that if he exercised his Fifth Amendment right to remain silent, he risked criminal penalty.[5] Second, Linville had no reasonable basis for believing that he risked revocation of his supervised release if he invoked the Fifth Amendment. For example, he

---

[5] True, the requirement here that Linville truthfully answer all questions is not identical to the requirement in *Murphy* to be truthful with probation in all matters. But that distinction in word choice does not make a difference on this issue. We have previously held that in order for conditions of probation to provide a sufficient "penalty" to overcome a defendant's free choice to remain silent, the threat of revocation must be "nearly certain." *Lara*, 850 F.3d at 692 (citing *Murphy*, 465 U.S. at 437-38). Linville has not met that standard.

11

offered no evidence that Long told him he would face any such penalty, such as revocation of his supervised release, for asserting his rights. As the district could found, Linville's interactions with the probation officer "did not involve any threat with respect to if you fail to answer, your probation's going to be revoked." J.A. 76; *see also Lara*, 850 F.3d at 692 ("There is no evidence that [the probation officer] told [the defendant] that his probation would be revoked if he did not admit to the uncharged [crimes]."). Also, as *Murphy* emphasized, "[Supreme Court] decisions have made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." *Murphy*, 465 U.S. at 438. And finally, the application note to the standard condition requiring those released under supervision to truthfully answer questions from their probation officers provides that despite "the condition . . . to 'answer truthfully' the questions asked by the probation officer, a defendant's legitimate invocation of the Fifth Amendment privilege against self-incrimination in response to a probation officer's question shall not be considered a violation of this condition." U.S.S.G. § 5D1.3 cmt. n.1. And as the Eleventh Circuit has noted, since the Sentencing Commission promulgated this amendment in 2016, "no supervised-releasee who chose or chooses to answer questions after that date could demonstrate that he reasonably believed or believes

12

he was or is faced with the classic penalty situation."[6] *McKathan v. United States*, 969 F.3d 1213, 1230 (11th Cir. 2020). [7]

### III.

In pressing his penalty situation argument, Linville points to two cases from other circuits. We find neither case persuasive. In *United States v. Saechao*, 418 F.3d 1073 (9th Cir. 2005), the Ninth Circuit held that a defendant on probation with a condition that he truthfully answer all questions from his probation officer faced a penalty situation when asked questions that called for potentially incriminating information. But in reaching this decision, that court relied heavily on the fact that, under Oregon law, "an invocation of the privilege does not constitute compliance with Oregon's probation conditions" requiring probationers to "promptly and truthfully answer all reasonable inquiries." *Id.* at 1079. Given that state law, the Ninth Circuit concluded that the state took the "the extra, impermissible step" of foreclosing a probationer's choice to remain silent. *Id.* at 1078

---

[6] We are unpersuaded by Linville's contention at oral argument that we should not rely on this application note because it was added after he was sentenced on his original conviction. *See United States v. Campbell*, 22 F.4th 438, 443 (4th Cir. 2022) (The "commentary to the Sentencing Guidelines is 'authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline . . . .'") (quoting *United States v. Stinson*, 508 U.S. 36, 38 (1993)).

[7] In *Murphy*, the Supreme Court expressly held open the question as to whether the analysis was subjective or objective because it found Murphy could not satisfy either one. 465 U.S. at 437. The same is true here. There is nothing in the record indicating Linville subjectively believed that if he invoked his right to remain silent, he would be subject to criminal penalty.

13

(citing *Murphy*, 465 U.S. at 436). It found that "there [was] certainly a reasonable basis under *Murphy* for a probationer to conclude that, although the invocation of the Fifth Amendment [was] not *explicitly* prohibited, an exercise of that right by invoking the privilege or simply by remaining silent would constitute grounds for revocation of probation." *Id.* at 1079 (emphasis in original). But as already stated, the law applicable here was quite different. Unlike the Oregon law from *Saechao*, clear federal law provides that invoking the Fifth Amendment could not constitutionally be grounds for revoking supervised release. So, even accepting *Saechao* would not help Linville.

Nor would accepting the Eleventh Circuit's *McKathan* decision help Linville. There, a condition of the criminal defendant's supervised release for a child pornography conviction was that he "answer truthfully all inquiries by the probation officer." *McKathan*, 969 F.3d at 1218. The court held that condition placed the defendant in a penalty situation when he was asked if his phone had internet access and later whether he had used it to view child pornography. *Id.* at 1221. The defendant there testified at the suppression hearing that his probation officer told him "if [he] did not follow the conditions [of his supervised release,] [he]'d be revoked and go back to prison." *Id.* But as noted above, Linville provided no such testimony. Nor was there any other evidence in the record indicating such a threat. Also, unlike the case here, McKathan's interaction with his probation officer took place before the Sentencing Commission's 2016 amendment to the application notes for the pertinent supervised release condition. So *McKathan* is distinguishable from Linville's case.

14

IV.

In sum, the government did not expressly or implicitly assert that it would revoke Linville's supervised release if he invoked his Fifth Amendment right to remain silent. And even if Linville believed invoking the Fifth Amendment would have risked revocation, his belief was not reasonable. For these reasons, we affirm the denial of the motion to suppress and judgment of the district court.

*AFFIRMED*