**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 21-4442**

_____

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

RICHARD LAVAR CARTER,

Defendant – Appellant.

_____

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. W. Earl Britt, Senior District Judge.  (5:20-cr-00178-BR-1)

_____

Argued:  September 22, 2023                    Decided:  November 21, 2023

_____

Before WYNN, QUATTLEBAUM, and HEYTENS, Circuit Judges.

_____

Affirmed in part, dismissed in part by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Wynn and Judge Heytens joined.

_____

**ARGUED:** Andrew DeSimone, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant.  John Gibbons, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON BRIEF:**  G. Alan DuBois, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant.  Michael F. Easley, Jr., United States Attorney, David A. Bragdon, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

_____

QUATTLEBAUM, Circuit Judge:

After committing armed robbery with an unidentified accomplice, Richard Lavar Carter pled guilty to Hobbs Act robbery and a firearm charge pursuant to an agreement with the government. At sentencing, the district court warned that Carter's decision to name his accomplice would be a "critical part" of its sentencing determination. J.A. 59. When Carter declined to name his accomplice, the district court imposed a sentence at the top of Carter's Sentencing Guidelines range.

On appeal, Carter asserts that the district court violated his Fifth Amendment privilege against self-incrimination by imposing a harsher sentence due to his failure to identify his accomplice and drawing adverse inferences from that failure. He further alleges that this Fifth Amendment violation rendered his sentence procedurally and substantively unreasonable. In addition to arguing against the merits of these challenges, the government moves to dismiss Carter's appeal based on the appellate waiver in his plea agreement. For the reasons below, we grant the government's motion to dismiss Carter's appeal to the extent he challenges the reasonableness of his sentence. We otherwise affirm.

I.

A.

We first recount the events that led to Carter's conviction and sentence. In the early morning hours of October 15, 2019, a man wearing a black bandana over his face and carrying a handgun entered a Waffle House in Johnston County, North Carolina. While racking the slide of his handgun and ejecting a live bullet, the man ordered the employees

2

to open the cash register. After grabbing money from the register, the man fled the restaurant. About an hour later, two men dressed in all black robbed a New Dixie Mart convenience store in the same county. One man brandished a handgun, while the other brandished an "AK style" rifle. J.A. 95. The man with the handgun struck one of the employees with his handgun, leaving an impression of what looked to be a portion of the firearm's serial number. The men forced the employees into a corner of the store. They then ordered one employee to open the cash register. After that, they took the money from the register and fled.

Noticing the similarities between the robberies, the police showed the Waffle House employees the surveillance footage of the New Dixie Mart robbery. Having recognized their assailant as Carter, their former co-worker, the Waffle House employees also identified Carter as the man with the handgun in the New Dixie Mart footage. The state soon filed several charges against Carter, resulting in a warrant for Carter's arrest. Carter turned himself in, but his accomplice was never identified.

B.

The state dropped its charges against Carter after a federal grand jury returned an indictment charging him with two counts of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a), two counts of brandishing a firearm during a crime of violence, in violation of § 924(c)(1)(A)(ii), and one count of felon in possession of ammunition, in violation of §§ 922(g)(1), 924. Pursuant to an agreement with the government, Carter pled guilty to one count of Hobbs Act robbery based on the New Dixie Mart robbery and one count of brandishing a firearm based on the Waffle House robbery. Carter's plea agreement also

3

contained an appellate waiver provision under which Carter agreed to waive his rights to appeal his conviction and sentence "on any ground, including any appeal pursuant to 18 U.S.C. § 3742," except post-conviction claims of ineffective assistance of counsel or prosecutorial misconduct. J.A. 81. In return, the government agreed to dismiss Carter's three remaining charges and not further prosecute Carter for conduct underlying the indictment.

The district court later held a plea hearing as required by Federal Rule of Criminal Procedure 11. After the district court found him competent to enter a plea, Carter affirmed that he was "absolutely sure" he wanted to plead guilty and had not been forced or threatened to enter a plea. J.A. 27. He also confirmed that he reviewed the plea agreement with his attorney before signing it. The district court then summarized the terms of his plea agreement, including Carter's appellate waiver. In doing so, the district stated, "[Y]ou've waived your right to appeal your sentence and conviction on any ground, including -- excuse me. Strike that. You've also waived your right to appeal your sentence in any post-conviction proceeding." J.A. 31. Carter affirmed that the district court "fairly and accurately summarized the terms and conditions of [the] plea agreement as [he] underst[ood] it." J.A. 31–32.

Finding that Carter possessed a "full and complete understanding of the nature of the charges and the maximum penalties provided by law, and that a factual basis exist[ed] for the plea," the district court accepted Carter's guilty plea. J.A. 34–35.

C.

A few months later, Carter returned to the district court for sentencing. The district court determined Carter's Sentencing Guidelines range to be 51 to 63 months for his robbery conviction, which was to run consecutive to the statutory minimum of 84 months for his firearm conviction. In total, Carter faced a Guidelines range of 135 to 147 months.

Carter's attorney asked the district court for a downward variance based on considerations relevant to 18 U.S.C. § 3553(a) factors, including Carter's work ethic and history of substance abuse, as well as his limited criminal history, which, according to his attorney, indicated that Carter's current offenses were out of character. The government argued against a downward variance, imploring the district court to consider the nature of the robberies, the work ethic of the employees whom Carter robbed and the escalation in Carter's criminal conduct. For the same reasons, the government requested that Carter be sentenced at the top of his Guidelines range.

Following allocution, the district court asked the government if it had apprehended Carter's accomplice in the New Dixie Mart robbery. When the government informed the district court that it had never identified Carter's accomplice, the district court asked if Carter had been "interviewed about it." J.A. 59. The government stated its understanding that "Carter advised he did not know or did not choose to speak to that matter" when interviewed by police. J.A. 59. The district court told Carter's attorney, "[T]hat's a very critical part of this Court's decision. Do you want to talk to your client, or do you feel comfortable answering the question now?" J.A. 59–60. After conferring with Carter, Carter's attorney explained, "They did ask him about the robberies. But at the same time

5

they were asking him -- they presented him with the paperwork for obtaining a lawyer, and he requested to have a lawyer." J.A. 60. Carter's attorney further noted that the parties did not sign a cooperation plea, so Carter had "not been asked in the context of this case who that person was . . . ." J.A. 60.

The district court then asked Carter, "Do you want to tell me who your accomplice was?" J.A. 60–61. Carter replied, "No, sir." J.A. 61. Immediately after Carter's response, the district court denied his request for a downward variance. Specifically rejecting Carter's arguments based on work ethic and aberrant behavior, the district court explained "that the government has effectively rebutted and pointed out to the Court reasons why a variant sentence should not be imposed." J.A. 61.

The district court then stated:

> All sentencings are tough. This one is particularly tough because of the choice made by the defendant to protect his co-defendant. The fact that he refuses even now when he's facing significant prison time to reveal who his co-defendant was shows me a complete and utter disregard of any care for society and for the other people who are in society, including his own mother sitting back there. It shows a disrespect for her; it shows a disrespect for the court system. It's just mind-boggling to me that the defendant continues to protect somebody who does not need or show any reason for protection. I've been trying to think of a reason why you might be protecting someone else, and the only reason I can think of is fear that whoever was armed with that automatic weapon or semiautomatic weapon who participated jointly with the defendant in those robberies is still out there and he . . . could have made threats against this defendant. But he chose to -- chooses at this time to yield to rather than doing the right thing and revealing who the other person was.
>
> Now, I may be getting myself into trouble here; I don't know. And I'm sure [Carter's attorney] is going to present this, or somebody will, to the Fourth Circuit Court of Appeals. But we'll see what they have to say about me using this as a basis for what I'm going to do.

6

I'm not going to impose an upward departure. I am going to impose a sentence that is within the guideline range, as requested by the government, at the very top of the guideline range because I think it is absolutely necessary to meet all the sentencing factors set out in the statute, including particularly the deterrent value to others and the punishment factor of this defendant.

J.A. 62–63.

Announcing that it had considered the Guidelines "range, as well as other relevant factors set forth in the [Guidelines], and those set forth in [§ 3553(a)]," the district court sentenced Carter to 147 months' imprisonment followed by a 5-year term of supervised release. J.A. 64.

## II.

Carter raises two issues on appeal.[1] First, Carter asserts that the district court violated his Fifth Amendment privilege against self-incrimination by imposing a harsher sentence based on his refusal to name his accomplice at sentencing and by inferring a lack of respect for society and the court system from that refusal. Second, Carter contends that his sentence is procedurally and substantively unreasonable due to that Fifth Amendment violation and the district court's failure to consider all of his non-frivolous arguments for a downward variance. Carter's counsel conceded at oral argument that the two issues raise the same constitutional challenge. We therefore construe Carter's second issue to be a reasonableness challenge based on the district court's failure to consider all non-frivolous arguments.

---

[1] Carter timely appealed his sentence. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

7

The government moves to dismiss Carter's appeal as barred by the appellate waiver in his plea agreement. Accordingly, before we can consider the merits of Carter's appeal, we must determine whether Carter's appellate waiver is enforceable against the issues he raises.

## A.

We review an appellate waiver de novo to determine its enforceability. *United States v. Boutcher*, 998 F.3d 603, 608 (4th Cir. 2021). "When the government seeks to enforce an appeal waiver and has not breached the plea agreement, we will enforce the waiver if it is valid and if the issue being appealed falls within its scope." *United States v. Beck*, 957 F.3d 440, 445 (4th Cir. 2020).

## 1.

Turning first to the validity of Carter's appellate waiver, an appellate waiver is valid if the defendant knowingly and voluntarily agreed to it. *Boutcher*, 998 F.3d at 608. To determine whether a defendant knowingly and voluntarily agreed to waive his appellate rights, we look to the totality of the circumstances, including the defendant's experience, conduct, educational background and knowledge of his plea agreement and its terms. *United States v. McCoy*, 895 F.3d 358, 362 (4th Cir. 2018). "Generally, though, 'if a district court questions a defendant regarding the waiver of appellate rights during the Rule 11 colloquy and the record indicates that the defendant understood the full significance of the waiver, the waiver is valid.'" *Id.* (quoting *United States v. Thornsbury*, 670 F.3d 532, 537 (4th Cir. 2012)).

8

Carter challenges his appellate waiver's validity by arguing that the district court struck from the Rule 11 hearing record its statement advising Carter of the waiver of his direct appellate rights. In support of this argument, he points to the district court's summary of the appellate waiver's language when it stated, "[Y]ou've waived your right to appeal your sentence and conviction on any ground, including -- excuse me. Strike that. You've also waived your right to appeal your sentence in any post-conviction proceeding." J.A. 31. According to Carter, when the district court said, "Strike that," it struck its entire explanation of the direct appellate waiver. But context proves otherwise. A comparison of the district court's statement and the appellate waiver's terms reveals that the district court began to quote the waiver's reference to the United States Code but stopped. Indeed, the waiver states that Carter agreed to waive his right to appeal his conviction and sentence "on any ground, including any appeal pursuant to 18 U.S.C. § 3742." J.A. 81. Fairly read, the district court struck only the word "including," not its preceding statement advising Carter of his waiver of his direct appellate rights. Consistently, after striking the word "including," the district court stated that Carter "also" waived his post-conviction appellate rights. J.A. 31.

Moreover, neither Carter nor his attorney expressed any confusion or concern with the district court's summarization of the appellate waiver. Carter instead affirmed that the district court fairly and accurately summarized the terms of his plea agreement. Carter also confirmed that he reviewed the terms of his plea agreement, necessarily including the appellate waiver, with his attorney. Based on the totality of the circumstances, Carter knowingly and voluntarily agreed to the appellate waiver. His appellate waiver is valid.

9

2.

We next consider whether the issues raised by Carter on appeal fall within the scope of his valid appellate waiver. We use traditional principles of contract law to determine whether an issue falls within the scope of a valid waiver. *United States v. Yooho Weon*, 722 F.3d 583, 588 (4th Cir. 2013). We will enforce a valid appellate waiver only if it "is clearly and unambiguously applicable to the issues raised by the defendant on appeal." *Id.*

Still, a defendant who agrees to a valid appellate waiver "does not subject himself to being sentenced entirely at the whim of the district court." *United States v. Marin*, 961 F.2d 493, 496 (4th Cir. 1992). Rather, a defendant "retains the right to obtain appellate review of his sentence on certain limited grounds." *United States v. Attar*, 38 F.3d 727, 732 (4th Cir. 1994). Defining these limited grounds, we have explained that a defendant does not, for instance, waive his right to appeal a sentence "where the sentencing court violated a fundamental constitutional or statutory right that was firmly established at the time of sentencing." *United States v. Archie*, 771 F.3d 217, 223 (4th Cir. 2014). We have also declined to enforce a valid appeal waiver against a challenge that a sentence was "based on a constitutionally impermissible factor such as race." *Marin*, 961 F.2d at 496.

Here, there is no dispute that the language of Carter's appellate waiver bars an appeal "on any ground" other than ineffective assistance of counsel or prosecutorial misconduct. *See* J.A. 81. Carter's reasonableness challenge, therefore, falls squarely within the waiver's scope. Challenging the reasonableness of his sentence based on the district court's failure to consider all of his non-frivolous arguments for a downward variance is also not one of the "limited grounds" that can overcome an otherwise valid appellate

10

waiver. *See Attar*, 38 F.3d at 732; *see also Marin*, 961 F.2d at 496 (explaining that allegations of "an improper application of the guidelines" or "a violation of a procedural rule" do not overcome a valid appellate waiver). Accordingly, the government's motion to dismiss Carter's reasonableness challenge is granted.

The parties' real disagreement over the appellate waiver's scope concerns whether the Fifth Amendment challenge constitutes one of the "limited grounds" for which Carter retained appellate rights. *See Attar*, 38 F.3d at 732. Carter argues that it does because the district court based its sentence on a constitutionally impermissible factor—Carter's exercise of his Fifth Amendment privilege against self-incrimination. The government disagrees, arguing that the district court did not violate any firmly established constitutional right by considering Carter's refusal to cooperate at sentencing.

While we have used both phrases in describing challenges not waived by a valid appellate waiver, we have not explained the relationship between a firmly established constitutional right and a constitutionally impermissible factor such as race. Recently, in *United States v. Singletary*, 75 F.4th 416, 422 (4th Cir. 2023), we stated:

> [W]e will "decline[ ] to enforce a valid appeal waiver . . . where the sentencing court violated a fundamental constitutional or statutory right that was firmly established at the time of sentencing," *United States v. Archie*, 771 F.3d 217, 223 (4th Cir. 2014), or where the court based its sentence "on a constitutionally impermissible factor such as race," *United States v. Marsh*, 944 F.3d 524, 528 (4th Cir. 2019) (internal quotation marks omitted).

This language could be read to suggest two separate grounds. Yet, a sentencing court's consideration of the constitutionally impermissible factor of race would also violate a firmly established, fundamental constitutional right—the right to equal protection under

11

the law. What, then, differentiates a sentencing court's use of a constitutionally impermissible factor such as race from its violation of a firmly established, fundamental constitutional right? Perhaps the grounds are not distinct. Instead, the use of a constitutionally impermissible factor such as race might simply be a subset of violations of firmly established fundamental, constitutional rights. While this issue might require clarification at some point, today is not that point. That is because even assuming they are distinct grounds, Carter cannot show either the violation of a fundamental constitutional right[2] that was firmly established at the time of his sentencing *or* the use of a constitutionally impermissible factor such as race as a basis for the district court's sentence.

The first ground is straightforward. Carter concedes that neither this Court nor the Supreme Court has decided whether a district court violates the Fifth Amendment by imposing a harsher sentence in light of a defendant's failure to cooperate. *See United States v. Strong*, 729 F. App'x 243, 245 (4th Cir. 2018). Carter also does not provide, and we have not found, any binding authority establishing that a district court violates the Fifth Amendment by inferring a lack of respect for society or the court system from a defendant's refusal to cooperate at sentencing. *Cf. Mitchell v. United States*, 526 U.S. 314, 330 (1999) (declining to decide whether a district court violates the Fifth Amendment by inferring a lack of remorse from a defendant's silence); *Roberts v. United States*, 445 U.S. 552, 553, 561 (1980) (holding that "the District Court properly considered, as one factor in imposing sentence, the petitioner's refusal to cooperate with officials investigating a criminal

---

[2] Carter does not allege any violation of a firmly established statutory right that would overcome an appellate waiver.

12

conspiracy in which he was a confessed participant"). Without binding authority to the contrary, Carter has not alleged the violation of a fundamental constitutional right that was firmly established at the time of his sentencing.[3]

We are thus left to consider whether Carter alleges that the district court relied on a constitutionally impermissible factor at sentencing. Our precedent does not clearly define this ground; instead, we tend to state without explanation that a defendant does not waive his right to challenge a sentence based on a "constitutionally impermissible factor such as race." *See, e.g.*, *Marsh*, 944 F.3d at 528; *Marin*, 961 F.2d at 496; *Attar*, 38 F.3d at 732; *Singletary*, 75 F.4th at 422. But, regardless of the exact contours of this ground, Carter's Fifth Amendment challenge fails for a separate reason, as we explain below.

B.

The Fifth Amendment's Self-Incrimination Clause provides that "[n]o person . . .

---

[3] We recognize that our sister circuits have reached inconsistent results in considering Fifth Amendment challenges like the one raised by Carter. Some have held that a district court violates a defendant's Fifth Amendment privilege against self-incrimination by imposing a harsher sentence based on the defendant's refusal to cooperate in implicating others. *See United States v. Rivera*, 201 F.3d 99, 101–02 (2d Cir. 1999); *United States v. Safirstein*, 827 F.2d 1380, 1388 (9th Cir. 1987); *United States v. Garcia*, 544 F.2d 681, 685–86 (3d Cir. 1976); *United States v. Acosta*, 501 F.2d 1330, 1337–38 (5th Cir. 1974) (Gee, J., dissenting), *adopted en banc*, 509 F.2d 539 (5th Cir. 1975). A subset of these circuits also determined that the Fifth Amendment precludes a district court from drawing unjustified adverse inferences from a defendant's noncooperation at sentencing. *See Safirstein*, 827 F.2d at 1388; *DiGiovanni v. United States*, 596 F.2d 74, 75 (2d Cir. 1979). But at least one circuit has held that a district court does not violate the Fifth Amendment by imposing a within-Guidelines sentence based on a defendant's noncooperation in implicating others. *See United States v. Klotz*, 943 F.2d 707, 710–11 (7th Cir. 1991). We need not weigh in on this split, as the existing authority from our Court and the Supreme Court demonstrates that Carter has failed to establish a firmly established, fundamental constitutional right.

13

shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. Applicable only to compelled testimony, this privilege against self-incrimination is typically not self-executing. *United States v. Riley*, 920 F.3d 200, 204 (4th Cir. 2019). As a general rule, if an individual wishes to receive the protections of the privilege, he must invoke it. *See Rogers v. United States*, 340 U.S. 367, 370 (1951).

Exceptions to this general rule exist, however. In certain situations that are considered inherently coercive, we will excuse an individual's failure to assert his privilege against self-incrimination. *See Riley*, 920 F.3d at 204. One such exception is when a criminal defendant faces a "classic penalty situation." *Minnesota v. Murphy*, 465 U.S. 420, 429–40 (1984). A classic penalty situation arises when "the government, 'either expressly or by implication, asserts that invocation of the privilege would lead to' punishment . . . ." *United States v. Linville*, 60 F.4th 890, 896 (4th Cir. 2023) (quoting *Murphy*, 465 U.S. at 435). In other words, a classic penalty situation exists when a defendant is made to choose between the Fifth Amendment privilege and punishment. *See Murphy*, 465 U.S. at 436. We have also recognized that, in the context of supervised release conditions, a classic penalty situation may still exist where the defendant had a reasonable basis to believe that he faced that choice. *See Linville*, 60 F.4th at 897.

1.

Carter acknowledges that he failed to assert his Fifth Amendment privilege against self-incrimination at sentencing. But Carter maintains that we should excuse this failure. According to Carter, the district court placed him in a classic penalty situation when it

14

"threatened a higher sentence if [he] did not waive his privilege against self-incrimination[.]" Reply Br. at 5.

In support of this contention, Carter primarily relies on two Supreme Court cases. Neither case is persuasive. In *Garrity v. New Jersey*, state attorney general officials interviewed police officers about allegations that they were fixing traffic tickets. 385 U.S. 493, 494 (1967). Before the interviews, the officials warned each officer that his statements could be used against him and that he possessed a privilege against self-incrimination. *Id.* But the officials further warned each officer that refusing to answer questions would result in removal from office. *Id.* The officers answered the questions, and the government used those answers in the officers' subsequent prosecutions for conspiracy. *Id.* at 495. Reversing the officers' convictions, the Supreme Court held that an individual's protection "against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office . . . ." *Id.* at 500.

A year later, the Supreme Court considered a similar scenario in *Gardner v. Broderick*, 392 U.S. 273 (1968). There, a police officer was summoned to testify before a grand jury investigating the alleged bribery and corruption of police officers. *Id.* at 274. The government advised the officer of his privilege against self-incrimination then asked him to sign a waiver of immunity. *Id.* The government told the officer that he would be fired if he did not sign the waiver. *Id.* After refusing to sign the waiver, the officer was fired. *Id.* at 274–75. Explaining that "the mandate of the great privilege against self-incrimination does not tolerate the attempt, regardless of its ultimate effectiveness, to coerce a waiver of the immunity it confers on penalty of the loss of employment," the

15

Supreme Court reversed the dismissal of the officer's claims for reinstatement and backpay. *Id.* at 279.

The facts of Carter's case are distinguishable from both of these cases. In *Garrity* and *Gardner*, the government expressly threatened the loss of employment if the officers invoked the Fifth Amendment. Here, the district court did not expressly state, nor did it even imply, that Carter's assertion of his privilege against self-incrimination would lead to a harsher sentence. Though the district court warned Carter's attorney that whether Carter identified his accomplice would be a critical part of its sentencing determination, it did not suggest that Carter's noncooperation would remain a critical part of its decision if Carter expressed a fear of self-incrimination. In fact, neither the Fifth Amendment nor any concern of self-incrimination ever came up. In other words, Carter was not forced to choose between the Fifth Amendment privilege and a harsher sentence. *See Murphy*, 465 at 436.

Nor did Carter have a reasonable basis to believe invoking his Fifth Amendment privilege would lead to a harsher sentence. *See Linville*, 60 F.4th at 897–98. Carter was represented by an attorney, who was given the opportunity to explain Carter's failure to identify his accomplice. Carter was even permitted to confer with his attorney before she responded to the district court's questions. Carter could have raised self-incrimination concerns at sentencing through his attorney, but he did not. The only explanation provided for Carter's noncooperation was the lack of a cooperation plea. In these circumstances, Carter did not face a classic penalty situation excusing his failure to invoke his Fifth Amendment privilege.

16

2.

Carter's case is, instead, analogous to that of the defendant in *Roberts v. United States*. Like Carter, the *Roberts* defendant alleged that the district court violated his Fifth Amendment privilege against self-incrimination by basing its sentencing determination on his noncooperation. 445 U.S. at 559. Also like Carter, the *Roberts* defendant and his attorney failed to raise any self-incrimination concerns at sentencing, despite being warned by the district court that the defendant's noncooperation would be considered. *Id.* The Supreme Court rejected the *Roberts* defendant's Fifth Amendment privilege challenge, stating, "At least where the Government had no substantial reason to believe that the requested disclosures are likely to be incriminating, the privilege may not be relied upon unless invoked in a timely fashion." *Id.* Explaining further, the Court stated:

> In this case, as in *Vajtauer v. Commissioner of Immigration*, 273 U.S. 103, 113, 47 S. Ct. 302, 306, 71 L. Ed. 560 (1927), petitioner "did not assert his privilege **or in any manner suggest** that he withheld his testimony because there was any ground for fear of self-incrimination. His assertion of it here is evidently an afterthought." The Court added in *Vajtauer* that the privilege "must be deemed waived **if not in some manner fairly brought to the attention of the tribunal** which must pass upon it." *Ibid*. Thus, if petitioner believed that his failure to cooperate was privileged, he should have said so at a time when the sentencing court could have determined whether his claim was legitimate.

*Roberts*, 445 U.S. at 560 (emphasis added).

Here, the district court had no substantial reason to believe that Carter's identification of his accomplice would be incriminating beyond the plea itself. Carter was asked to name his accomplice in specific conduct for which he had already been convicted or received immunity in his federal case and for which his state charges were dismissed.

17

For the first time on appeal, Carter contends that naming his accomplice still could have led to the discovery of other information that might trigger his prosecution by state officials, who did not grant him immunity when dismissing his charges, or by federal officials, who only granted him immunity for the conduct underlying his indictment. True, a defendant's identification of an accomplice could possibly lead investigators to uncover information that incriminates the defendant. But Carter did not express this concern at sentencing, as it "is evidently an afterthought." *See id.* (quoting *Vajtauer*, 273 U.S. at 113). As such, he did not "in any manner suggest" he was concerned about self-incrimination and, therefore, did not "fairly" bring that issue to the district court's attention. *See id.* (quoting *Vajtauer*, 273 U.S. at 113). For these reasons, the district court did not have a substantial reason to believe its inquiry might incriminate Carter.

Carter's self-incrimination concerns would have merited further analysis had he raised them before the district court. But he did not, and the district court was left without any substantial reason to believe that Carter's identification of his accomplice was likely to be incriminating. *See id.* at 559. Carter's reliance on the Fifth Amendment privilege comes too late. Thus, his Fifth Amendment challenge fails.[4]

---

[4] We express no opinion as to the merits of Carter's Fifth Amendment challenge had he properly invoked the Fifth Amendment privilege or in any manner suggested that he was concerned about self-incrimination at sentencing. We likewise do not express any view as to whether Carter might have had other valid reasons for not identifying his accomplice. For example, the district court speculated that fear of reprisal might have been a concern. But whether valid or not, that concern does not implicate the Fifth Amendment, which is the ground on which Carter challenged his sentence.

III.

To summarize, we grant the government's motion to dismiss with respect to Carter's reasonableness claim. We otherwise affirm Carter's sentence, as Carter never took the requisite step of invoking his Fifth Amendment right against self-incrimination before the district court.

*AFFIRMED IN PART, DISMISSED IN PART*

19