**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellant,*

            v.

PHATA SAECHAO,
            *Defendant-Appellee.*

No. 04-30156

D.C. No.
CR-03-00447-RAE

OPINION

Appeal from the United States District Court
for the District of Oregon
James A. Redden, District Judge, Presiding

Argued and Submitted
March 10, 2005—Portland, Oregon

Filed August 12, 2005

Before: Stephen Reinhardt, Marsha S. Berzon, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Reinhardt

**COUNSEL**

Richard A. Friedman, United States Department of Justice, Washington, DC (Argued); Karen J. Immergut, Frederic N. Weinhouse, United States Attorney's Office, Portland, Oregon (On the Briefs), for the plaintiff-appellant.

Lisa Hay, Office of the Federal Public Defender, Portland, Oregon, for the defendant-appellee.

## OPINION

REINHARDT, Circuit Judge:

### I.

The issue on this appeal is whether a probationer who provides incriminating information to his probation officer in response to questions from that officer, and does so pursuant to a probation condition that requires him to "promptly and truthfully answer all reasonable inquiries" from the officer or face revocation of his probation, is "compelled" to give incriminating evidence within the meaning of the Fifth Amendment. Because we conclude that the state took the "impermissible step" of requiring the probationer "to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent," *Minnesota v. Murphy*, 465 U.S. 420, 436 (1984), we hold that his admission of criminal conduct was compelled by a "classic penalty situation" and the evidence obtained by the probation officer may not be used against him in a criminal proceeding. We therefore affirm the district court's order suppressing the fruits of the state's unlawful conduct.

### II.

Phata Saechao pled guilty to a state felony offense and was sentenced to state probation. The felony, which involved an act of domestic violence, was his first. The day after his plea, Saechao met with his intake officer, Heather Fowler, to review the conditions of his probation. Condition number 11 required Saechao to "promptly and truthfully answer all reasonable inquiries by the Department of Correction or County Community Correction Agencies," and condition number 12 prohibited him from possessing "weapons, firearms, or dangerous animals." The terms of his probation also provided that failure to comply with any of the conditions was grounds for arrest, revocation of probation, or modification of conditions.

Saechao signed the probation form, but was not asked by Fowler at the time whether he possessed a firearm. After the intake meeting, Saechao was told to call the domestic violence unit to report to his assigned probation officer within a week's time.

After the intake meeting, Saechao was assigned to Probation Officer Andrew Altman of the domestic violence unit for the supervision of his probation. Saechao attempted to contact Altman several times over the next month and finally had his first meeting with Altman over a month after his initial intake interview with Fowler. According to Altman's testimony, the meeting was designed to "figure out the personal needs of [the probationer] . . . , [to] try and assess the compliance with the conditions of supervision, [to] make sure [the probationer is] very clear about what the conditions are, [to] review them again, . . . [and to] get [his] expectations to them."

Altman began the meeting by reviewing once again the conditions of Saechao's probation, including the requirement that Saechao "promptly and truthfully answer" Altman's inquiries. Altman then began the interview, during which he repeatedly asked whether Saechao possessed a firearm. As a result of Altman's questioning, Saechao eventually acknowledged that there was a 30.06 hunting rifle that he used for deer hunting in the apartment that he shared with his parents, a rifle that he possessed legally prior to the time of his conviction. Possession of the firearm became illegal under the felon-in-possession statute upon Saechao's felony conviction. *See* 18 U.S.C. § 922(g)(1). Altman later testified that it was clear from the interview that Saechao had been concerned about the rifle even before the meeting, but that he "didn't know what to do with the firearm. He had paid money for the firearm. It was worth money, and he hadn't made a decision what to do with it at [that] point."

After Saechao's admission of "possession," Altman explained the seriousness of his conduct and convinced

Saechao to accompany him and Probation Officer Matthew Ferguson back to the apartment Saechao shared with his parents so that the officers could remove the rifle. After speaking with his parents, Saechao directed the officers to a room where Altman and Ferguson confiscated an unloaded 30.06 hunting rifle from underneath the mattress. Altman and Ferguson then left. Saechao was not arrested at the time.

Altman later discussed the case with his supervisor and decided that instead of excusing Saechao's violation, or even pursuing a revocation of probation, they would turn the evidence over to the federal authorities so that they could initiate a federal prosecution against him for possession of a firearm by a convicted felon. Altman acknowledged that the referral to federal authorities was not routine.[1] A month later, the federal authorities arrested Saechao and charged him with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

The district court granted Saechao's motion to suppress his statements to Altman. It found that Saechao "did not have free choice to refuse to answer questions about firearms precisely because those questions related to a specific condition of his probation." *United States v. Saechao*, No. CR 03-447-RE (D. Or. Mar. 5, 2004) (opinion and order granting the defendant's motion to suppress statements). Thus, the district court concluded, the statements were "compelled," in violation of the Fifth Amendment to the United States Constitution. The United States appeals the suppression order.

---

[1]Probation Officer Ferguson, who worked with Altman, explained that when a probation officer first meets with a probationer and learns that he is in possession of a rifle, "it is kind of a rule of thumb" that the probation officer give the probationer "24 hours to have someone else take possession of the rifle, get it out of the home . . . give [them] some time to get that disposed of" instead of filing for revocation of probation or other criminal proceedings outright.

### III.

We must determine whether Saechao was compelled by threat of penalty to answer his probation officer's questions regarding his possession of firearms. In *Murphy*, the Supreme Court explained that if a state attaches "[t]he threat of punishment for reliance on the privilege" against self-incrimination by asserting either "*expressly or by implication . . . that invocation of the privilege would lead to revocation of probation . . .* the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." *Id.* at 435 (emphasis added). Because the state of Oregon took the "impermissible step" of "requir[ing] [Saechao] to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent," we hold that Saechao's statements were compelled and therefore inadmissible in the ensuing criminal prosecution. *Id.* at 436.

**[1]** As a general rule, "the [Fifth] Amendment speaks of compulsion. . . . If [an individual] desires the protection of the privilege, he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment." *Id.* at 427 (quoting *United States v. Monia*, 317 U.S. 424, 427 (1943) (first alteration in original) (internal quotation marks omitted)). There are, however, exceptions to this rule. The Court has held that if an individual is subjected to a practice that "den[ies him] . . . a 'free choice to admit, to deny, or to refuse to answer,' " then any statement he makes is considered involuntary and cannot be used in a criminal proceeding. *Garner v. United States*, 424 U.S. 648, 657 (1976) (quoting *Lisenba v. California*, 314 U.S. 219, 241 (1941)). In these cases, the Fifth Amendment is considered "self-executing," and an individual does not need to invoke it in order to have his admissions suppressed in an ensuing criminal prosecution. *Murphy*, 465 U.S. at 435.

**[2]** One instance in which an individual is held to have been denied the free choice to admit, to deny, or to refuse to

answer is what the Court refers to as a "penalty situation."[2] *Id.* If an individual's refusal to answer incriminating questions subjects him to a penalty, then the Fifth Amendment is self-executing and any statements made under threat of such penalty are inadmissible.[3] In the probationary context, this means that although the state is permitted to require a probationer to "appear and discuss matters affecting his probationary status," the probationer may not be required under threat of revocation of probation to respond to "questions put to [him], however relevant to his probationary status, [that] call for answers that would incriminate him in a pending or later criminal proceeding." *Id.* The key to whether the Fifth Amendment is self-executing in probation cases lies in the following statement by the Court: "[I]f the State, either *expressly or by implication*, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled

---

[2]Other exceptions include custodial interrogations and gambler's excise taxes, neither of which is relevant to our analysis. *See Murphy*, 465 U.S. at 429, 439.

[3]Addressing these penalty cases, "the Court has held that loss of job, loss of state contracts, loss of future contracting privileges with the state, loss of political office, loss of the right to run for political office in the future, and revocation of probation all are 'penalties' that cannot be imposed on the exercise of the privilege." *United States v. Frierson*, 945 F.2d 650, 658 (3d Cir. 1991); *see Lefkowitz v. Cunningham*, 431 U.S. 801 (1977) (finding attorney's Fifth Amendment immunity violated when the State divested him of his state political party office for refusing to waive his constitutional immunity before a grand jury); *Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation*, 392 U.S. 280 (1968) (finding Fifth Amendment violation when city employees were discharged for invoking Fifth Amendment privilege against self-incrimination); *Gardner v. Broderick*, 392 U.S. 273 (1968) (finding Fifth Amendment violation when police officer was threatened with and subsequently discharged from employment if he did not waive his Fifth Amendment immunity in conjunction with a grand jury investigation); *Garrity v. New Jersey*, 385 U.S. 493 (1967) (finding Fifth Amendment violation when police officers gave coerced confessions under threat of discharge).

and inadmissible in a criminal prosecution." *Id.* (emphasis added). As the Supreme Court explained, in order for a court to determine whether a probationer is subject to a penalty situation, it "must inquire whether [his] probation conditions merely required him to appear and give testimony about matters relevant to his probationary status or whether they went further" by taking "the extra, impermissible step" of requiring him "to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent." *Id.* at 436.

Although the Supreme Court in *Murphy* set forth the governing legal standard for a classic penalty situation, it ultimately found that Murphy's admission was not compelled under threat of penalty because of the particular nature of his probation conditions. The Supreme Court first found that Murphy's probation conditions did not actually require him to answer his probation officer's inquiry. *Id.* at 437. The Court noted that Murphy's conditions required him only to "be truthful with his probation officers in all matters," and did not impose any affirmative obligation to respond to his probation officer's questions: "On its face, [the] probation condition proscribed only false statements; it said nothing about his freedom to decline to answer particular questions . . . ." *Id.* at 436, 437. In light of the limitations of Murphy's probation condition, and the state's subsequent insistence that "it would not, and legally could not," on the basis of a "be truthful" condition, "revoke probation for refusing to answer questions calling for information that would incriminate in separate criminal proceedings," the Court concluded that Murphy could not have been objectively or subjectively "deterred from claiming the privilege by a reasonably perceived threat of revocation." *Id.* at 438-39. Unlike in the case of *Murphy*, Saechao was compelled by threat of penalty to answer the probation officer's inquiry about firearms. The terms of his probation compelled him to *answer* "*all* reasonable inquiries."[4]

---

[4]We construe "reasonable" to be a limitation regarding relevance. The questions must bear a reasonable relationship to a subject of legitimate

The Oregon probation condition at issue was, thus, categorically different from the "be truthful" condition in *Murphy*. *See Murphy*, 465 U.S. at 422. Not only was Saechao required to be truthful to his probation officers, but he was expressly required, under penalty of revocation, to "promptly . . . *answer all* reasonable inquiries." Contrary to the government's contentions, there *is* a significant difference between being required to be "truthful with . . . probation officer in all matters," *Murphy*, 465 U.S. at 422 (internal quotation marks omitted), and being required to "promptly and truthfully *answer all* reasonable inquiries." Whereas the former "sa[ys] nothing about [a probationer's] freedom to decline to answer particular questions" and "proscribe[s] only false statements," the latter specifically penalizes a refusal to "answer particular questions." *Murphy*, 465 U.S. at 437. In contrast to Murphy, who the Supreme Court found was free to remain silent as long as he was truthful when he spoke, Saechao did not have the luxury of remaining silent without violating the conditions of his probation. Failure to answer a relevant inquiry regarding the conditions of probation would have justified the revocation of his probation.

The government argues that a probationer is subject to threat of penalty only when the state *explicitly* announces that it will impose a penalty for the invocation of his Fifth Amendment rights — that an announcement that it will punish him for any failure to answer a question is not sufficient. In order to violate *Murphy*, the government asserts, Oregon must specifically state to the probationer: "we will revoke your probation if you invoke your Fifth Amendment privilege." We reject the government's argument. Not only is it contrary to the plain language of the Supreme Court's decision in *Mur-*

inquiry. The government does not contend, quite correctly, that the reasonableness requirement excuses failures to respond to questions that would elicit incriminating information or permits the invocation of the Fifth Amendment.

*phy*, but also to the Oregon state court's interpretation of its own probation conditions.

**[3]** *Murphy* held that a penalty situation is created if there is a "reasonable basis for concluding that [the state] attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination." *Id.* at 437. *Murphy* also explained that a state creates a classic penalty situation if it "expressly or *by implication*" suggests "that invocation of the privilege would lead to revocation of probation." *Id.* at 435 (emphasis added). Here, Saechao was required, as a condition of his probation, to "promptly and truthfully *answer all* reasonable inquiries." In requiring *answers* to *all* such inquiries, the condition makes no exception for the invocation of the Fifth Amendment and, thus, by implication forecloses a probationer's ability to exercise that right by remaining silent. In light of the particular conditions applicable to Oregon probationers, there is certainly a reasonable basis under *Murphy* for a probationer to conclude that, although the invocation of the Fifth Amendment is not *explicitly* prohibited, an exercise of that right by invoking the privilege or simply by remaining silent would constitute grounds for revocation of probation.

The government's argument also runs counter to the interpretation of Oregon's probation conditions by the Oregon state courts.[5] In *State v. Gaither*, 100 P.3d 768, 769 (Or. Ct. App. 2004), *rev. denied*, 113 P.3d 435 (Or. 2005), the Oregon Court of Appeals held that statements elicited by a probation officer were "compelled" even though there was no express reference to the Fifth Amendment privilege in the probation conditions. The probationer in *Gaither* was not specifically

---

[5]In *Murphy*, the Court was influenced by the fact that Minnesota, the state that imposed the probation conditions, represented that it could not (and would not) have revoked the defendant's probation had the probationer invoked the Fifth Amendment. *Id.* at 438-39. Here Oregon has made no similar representation. To the contrary, the Oregon courts have declared that a refusal to provide the requested information can result in a probation revocation.

informed that under the terms of his Oregon probation he could be punished if he asserted his right to remain silent, and he was not specifically threatened with probation revocation or other penalties if he invoked the privilege. Nevertheless, addressing probation conditions that required the defendant to "promptly and truthfully answer all reasonable inquiries" and "fully disclose his sexual history and provide a list of all . . . prior victims," the state court held that the probationer was given an impermissible choice in violation of *Murphy*. *Id.* at 770, 772-73. In so finding, the Oregon court implicitly held both that an express declaration that the probationer may not invoke the Fifth Amendment is not required, and that an invocation of the privilege does not constitute compliance with Oregon's probation conditions. It concluded that under the terms of his probation, Gaither "had no choice other than to disclose or face revocation of probation." *Id.* at 772. In so doing, the Oregon court necessarily determined that Oregon "legally could . . . revoke probation for refusing to answer questions calling for information that would incriminate in separate criminal proceedings." *Murphy*, 465 U.S. at 438.[6]

---

[6]The government argues that the *Gaither* decision actually supports its position because it affirms *State v. Tenbusch*, 886 P.2d 1077 (Or. Ct. App. 1994). It asserts that *Tenbusch* is an authoritative state court interpretation that the probation conditions involved here do not penalize Saechao for refusing to answer and remaining silent. *Tenbusch*, however, involved a condition that simply required the probationer to submit to a polygraph examination about his sexual history and his compliance with the other terms of his probation. *Id.* at 1078. Like *Murphy*, the state court found that the conditions' "overriding focus . . . [was] on truthfulness" and "not making false statements," and did not actually require the probationer to answer incriminating questions. *Id.* at 1082 (emphasis removed). Unlike the conditions involved in *Tenbusch*, Saechao was affirmatively required to *answer all* inquiries. The "third option" of invoking and exercising the right to remain silent, which the *Tenbusch* court found available in that case, was foreclosed here by the applicable probation condition. *See id.* at 1083. Although *Tenbusch* contains language that could be read as requiring a specific reference to the Fifth Amendment in the probation conditions, such a reading would be entirely inconsistent with its affirmation in *Gaither*. The purported reading is erroneous for two other reasons. First, *Tenbusch* acknowledges *Murphy*'s ruling that "[i]f the State, either

The government next puts a slightly different twist on its basic argument by asserting that even if Oregon's probation conditions foreclosed Saechao's ability simply to remain silent, and required him to answer the probation officer's inquiry, Saechao could have satisfied the conditions by "promptly answer[ing] the question by invoking the privilege, or promptly ask[ing] for clarification, or promptly seek[ing] legal advice on whether the privilege applies." We reject this creative recasting of its argument.

The government's contention is based on an incorrect reading of the probation condition at issue. Saechao was required to "promptly and truthfully *answer* all reasonable inquiries." The condition did not simply require a prompt statement of some kind — such as a statement setting forth a reason for *not* answering the question. Rather, the condition expressly requires an *answer* to the question being asked. A verbal invocation of the right to remain silent followed by the act of *not* responding to incriminating questions is, by definition, not answering a question, let alone providing a prompt and truthful answer. A refusal to answer, even if it could somehow be called an answer, constitutes neither a truthful nor an untruthful response. It is non-substantive in nature. For that reason alone, invoking the privilege, asking for clarification, or seeking legal advice, could not satisfy the requirement for a prompt and *truthful* answer.

**[4]** The Eleventh Circuit, confronted with a nearly identical probation condition, explicitly rejected the argument that by "answering" a probation officer's inquiry with an invocation of the Fifth Amendment, the probationer would comply with

*expressly or by implication*, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation . . . ." *Tenbusch*, 886 P.2d at 1082 (quoting *Murphy*, 465 U.S. at 435) (emphasis added). Second, a penalty directed to "a failure to answer questions" meets any reasonable specificity requirement regarding the exercise of the right to remain silent.

an obligation to answer or respond to his probation officer's inquiries and thereby avoid a revocation of his probation. In *United States v. Robinson*, 893 F.2d 1244 (11th Cir. 1990), the court considered a federal probation condition that required probationers to "report and to give an account of [himself] and *to respond completely and truthfully to questions* asked by the probation officer." *Id.* 1244-45 (alteration in original) (internal quotation marks omitted) (emphasis added). When Robinson was asked a question that required an incriminating response, he followed the course of conduct proposed by the government in this case and invoked the Fifth Amendment. *See id.* at 1244. That invocation, however, promptly led the government to seek the revocation of Robinson's probation, which the district court granted and the Eleventh Circuit affirmed. *See id.* at 1244-45. Interpreting the condition in the manner there requested by the government, the Eleventh Circuit held that invoking the Fifth Amendment did not constitute a response to a question, but rather was "a refusal to answer that violated an express condition of probation." *Id.* at 1245 (quoting *Murphy*, 465 U.S. at 435 n.7). The Eleventh Circuit ruled that by asserting the privilege the probationer failed to comply with the condition requiring him to answer his probationer officer's inquiries, and "that such failure alone can justify revocation of probation." *Id.* (quoting *United States v. Morin*, 889 F.2d 328, 332 (1st Cir. 1989)).

[5] In light of the Eleventh Circuit's holding in *Robinson* and that circuit's acceptance of the United States' position that invoking the Fifth Amendment does *not* constitute compliance with a condition similar to that at issue here, we reject its assertion of the contrary argument in this case. We find it troubling that the United States, having successfully sought revocation of probation in the past for the very conduct that it suggests Saechao should have engaged in here, now assures us unabashedly that such conduct would not justify the revocation of Saechao's probation.

[6] In sum, we hold that the district court did not err in suppressing the fruits of the state's impermissibly coercive pen-

alty threat. Saechao was indeed "compelled" to incriminate himself under threat of probation revocation. He was instructed on two occasions that his probation conditions required him, *inter alia*, to "promptly and truthfully answer all reasonable inquiries" and the terms of his probation provided that a failure to comply could result in its revocation. Moreover, the state did not advise him that "it would not, [or] legally could not, revoke probation for refusing to answer questions calling for information that would incriminate in separate criminal proceedings." *Murphy*, 465 U.S. at 438. To the contrary, the state court's holding in *Gaither* (as well as the ruling that the government elicited from the Eleventh Circuit in *Robinson*) confirms that such a revocation is possible and could be pursued by the state. Thus, we conclude that, unlike in *Murphy*, the probation conditions in this case constitute an attempt by the state "to attach an impermissible penalty to the exercise of the privilege against self-incrimination." *Id.* at 437. The evidence obtained in this case was properly suppressed by the district court.

## IV.

The Fifth Amendment proscribes the use in a separate criminal proceeding of a statement obtained pursuant to a probation condition that requires a probationer to "choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent." *Id.* at 436. If, by virtue of its probation conditions, a state expressly or *implicitly* penalizes the exercise of the right to remain silent, then the probationer's answers to incriminating questions posed by his probation officer are deemed compelled and are inadmissible in ensuing criminal proceedings. *See id.* at 435. Oregon's probation conditions provide for precisely such a penalty. Accordingly, we affirm the district court's decision to suppress the evidence obtained as a result of Saechao's inculpatory responses to his probation officers' inquiries.

**Affirmed.**