**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

TYLER JAY WATSON,

*Defendant - Appellant.*

No. 24-1865

D.C. No.
1:22-cr-00149-
BLW-1

OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, District Judge, Presiding

Argued and Submitted April 22, 2025
Moscow, Idaho

Filed May 23, 2025

Before: Richard C. Tallman, N. Randy Smith, and Ryan D.
Nelson, Circuit Judges.

Opinion by Judge Tallman

# SUMMARY[*]

## Criminal Law

The panel affirmed the district court's denial of Tyler Jay Watson's motion to suppress incriminating statements he made to police officers and the fruits thereof in a case in which Watson entered a conditional guilty plea to one count of possession with intent to distribute fentanyl.

Based on information received from a confidential informant, a police task force in Nampa, Idaho began investigating Watson for drug distribution. When law enforcement learned that Watson was on parole, they coordinated with Probation and Parole officers to conduct a compliance search of Watson's vehicle and residence. After officers found methamphetamine attached to the vehicle's undercarriage, they drove to Watson's residence and conducted a search. While the search was ongoing, Watson remained detained in an officer's patrol vehicle parked down the street. Another officer approached Watson in the back of the patrol car and read Watson his *Miranda* rights. Watson acknowledged his rights and stated his willingness to cooperate. Watson then admitted he was holding more of "the product" at his grandmother's home. Following Watson's confession, officers drove to Watson's grandmother's house and obtained her consent to search her garage. Officers discovered and seized fentanyl, methamphetamine, and cash.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Watson argued that his supervision agreement's condition requiring that he cooperate with the requests of his probation/parole officer, where cooperation includes being truthful, created a classic penalty situation in which Watson was compelled—under threat of parole revocation—to make incriminating statements to law enforcement in violation of his Fifth Amendment rights. The panel disagreed. Because Watson's supervision agreement required cooperation and truthfulness with his parole officer, but not all law enforcement officers, the panel could not conclude that a Mirandized interrogation by police in the course of investigating a new, separate offense was involuntarily compelled.

## COUNSEL

David J. Morse (argued), Assistant United States Attorney; Joshua D. Hurwit, United States Attorney; Office of the United States Attorney, United States Department of Justice, Boise, Idaho; for Plaintiff-Appellee.

Mikela French (argued), Mike French Law PLLC, Boise, Idaho, for Defendant-Appellant.

**OPINION**

TALLMAN, Circuit Judge:

Based on information received from a reliable confidential informant ("CI"), a police task force in Nampa, Idaho, began investigating Defendant-Appellant Tyler Jay Watson for drug distribution. When law enforcement learned that Watson was on parole, they coordinated with Probation and Parole ("P&P") officers to conduct a compliance search of Watson's vehicle and residence. The CI had advised officers that Watson transported drugs in magnetized containers under his vehicle. After officers found methamphetamine attached to the vehicle's undercarriage, they drove to Watson's residence and conducted a search. While the search was ongoing, Watson remained detained in Officer Scott's patrol vehicle parked down the street. A police officer, Detective Coronado, approached Watson in the back of the patrol car and read Watson his *Miranda* rights. Watson acknowledged his rights and stated his willingness to cooperate. Watson then admitted he was holding more of "the product" at his grandmother's home. Following Watson's confession, officers drove to Watson's grandmother's house and obtained her consent to search her garage. Officers discovered and seized fentanyl, methamphetamine, and cash.

Watson was charged with one count of possession with intent to distribute fentanyl. He filed a motion to suppress the incriminating statements he made to Detective Coronado and the evidence seized from his vehicle and his grandmother's home, alleging they were the product of Fourth and Fifth Amendment violations. Following an

evidentiary hearing, the district court denied the motion, finding that each search was constitutional and that Watson's admissions to Detective Coronado were not involuntarily compelled. Watson subsequently conditionally pled guilty and was sentenced to 188 months of imprisonment.

On appeal, Watson argues that his Agreement of Supervision's ("Agreement") condition requiring that he "cooperate with the requests of [his] probation/parole officer," where "[c]ooperation includes being truthful," created a "classic penalty situation" in which Watson was compelled—under threat of parole revocation—to make incriminating statements to law enforcement. We disagree. Watson's statements were made to a police officer, not his P&P officer, after an adequate *Miranda* warning.

Because Watson's Agreement required cooperation and truthfulness with his *parole officer*, but not all law enforcement officers, we cannot conclude that a Mirandized interrogation by police in the course of investigating a new, separate offense was involuntarily compelled. Accordingly, we affirm the district court's denial of Watson's motion to suppress and hold that Watson was not subject to a penalty situation under these circumstances.

# I

In May 2022, Watson was on parole supervision from the Idaho Department of Corrections ("IDOC") when Nampa Police Department ("NPD") officers and Federal Drug Enforcement Administration ("DEA") agents became aware of his involvement in drug trafficking. A CI told the interagency drug task force officers that Watson was dealing narcotics, storing controlled substances at two different locations, and transporting the narcotics in magnetic boxes in and under his vehicle. After obtaining a warrant, the task

force intercepted communications between Watson and his supplier. Those communications corroborated the information provided by the CI and led investigators to believe that Watson was trafficking in large quantities of fentanyl powder—enough to generate a weekly payment of at least $15,000 to his supplier.

Upon further investigation, task force officers confirmed with IDOC P&P officers that Watson was on parole and was known to frequent his current registered parole residence— his mother's home—and his previously registered parole residence—his grandmother's home. Officers also learned that Watson had signed an Agreement outlining the terms and conditions of his parole that prohibited his use and possession of controlled substances and waived his Fourth Amendment rights. By signing the Agreement, Watson consented to a search of his "person, residence, vehicle, personal property, and other real property . . . by any agent of IDOC or a law enforcement officer." Another condition in the Agreement stated:

> I will cooperate with the requests of my probation/parole officer. Cooperation includes being truthful. If I am detained by law enforcement, I will tell the officer(s) that I am on felony supervision, and the name of my probation/parole officer. I will notify my probation/parole officer of any such contact within 24 hours.

With the information the task force garnered during its investigation, officers planned an operation to conduct a traffic stop to perform a parole compliance search of Watson's vehicle as permitted by the Agreement.

On the morning of the planned operation, officers were briefed and surveilling Watson's home when they watched him depart. Officers observed Watson make a turn without using his signal, and NPD Officer Jared Scott, who had been briefed on the operation earlier in the day, conducted a traffic stop. Officer Scott explained to Watson that he had been stopped due to a failure to use a turn signal. Officer Scott obtained Watson's license and registration, asked some questions to gauge Watson's demeanor and cooperation level, and ensured that there were no firearms or other weapons in the vehicle. After receiving confirmation from P&P officers that they wanted Watson's vehicle searched, officers detained Watson, handcuffed him, and put him in the back of Officer Scott's patrol vehicle while Officer Scott and other investigators searched Watson's vehicle.

While the vehicle search was underway, P&P Officer Steve Landers approached Watson, who was still detained in the back of the police cruiser. P&P Officer Landers asked Watson whether they would find anything in Watson's vehicle. Watson stated they would not. Shortly thereafter, P&P Officer Chance Nicholas arrived on the scene, told Watson he knew about the drug investigation, and asked Watson for the passcode to his cell phone. Watson provided the passcode. No further interaction between P&P officers and Watson occurred after this conversation.

While searching Watson's vehicle, task force officers discovered two magnetic boxes containing suspected controlled substances attached to the vehicle's undercarriage below the driver's side door. Officer Scott transported Watson to his residence (his mother's home), where Watson remained in the police car while investigators searched his residence pursuant to the Agreement. During this time, NPD Detective Michael Coronado and two DEA agents

approached Watson while he was sitting in the back of the police car.[1]  Detective Coronado read Watson his *Miranda* rights,[2] and Watson confirmed that he understood his rights and was willing to talk to officers.  Detective Coronado explained to Watson that police knew he was "holding the product" at his grandmother's residence on Nez Perce Street.  Watson responded, "Yeah, it's there," and agreed to show Detective Coronado where it was located.  The group then drove to Watson's grandmother's house.

Once at the grandmother's home, officers obtained her consent to search the garage.  During the garage search, Detective Coronado asked Watson if he would be willing to show investigators where the controlled substances were located so they could avoid exposure to any fentanyl.  Watson agreed.  Officer Scott escorted Watson into the garage, and Watson showed the investigators where the drugs and illicit drug proceeds were located.  Investigators found over four and a half kilograms of fentanyl powder, approximately two ounces of methamphetamine, and approximately $8,600 in drug proceeds.

---

[1] Detective Coronado testified that he approached and interviewed Watson about two and a half hours after the initial traffic stop occurred.  Detective Coronado also testified that no P&P officers were in the vicinity of the patrol car at this time.

[2] The district court found that Detective Coronado adequately conveyed to Watson his rights.  Detective Coronado testified that he read the *Miranda* warning from a picture of a card provided by Canyon County prosecutors, which lists an individual's rights while in custody as required by *Miranda*.  Watson does not challenge the sufficiency of the *Miranda* warning on appeal.  Instead, he argues that even an adequate warning was insufficient to remedy the coercive and misleading effect of P&P officers' involvement in the searches.

## II

Watson was indicted on one count of possession with intent to distribute fentanyl in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). He moved to suppress the statements he made to the officers as well as the physical evidence found in the vehicle and at his grandmother's house as violations of the Fourth and Fifth Amendments.[3] More specifically, Watson argued that his incriminating statements to Detective Coronado were involuntarily compelled because his Agreement contained a condition requiring cooperation with his parole officer. Because failure to comply with this condition could result in revocation of his parole, Watson argued this parole condition created a "penalty situation" that runs afoul of the Fifth Amendment.

The district court denied Watson's motion to suppress. The district court distinguished the case from *Minnesota v. Murphy*, 465 U.S. 420 (1984), and *United States v. Saechao*, 418 F.3d 1073 (9th Cir. 2005), which addressed the potentially coercive effect of parole conditions on incriminating statements made to parole officers. Unlike those cases, Watson's incriminating statements were made to a law enforcement officer, Detective Coronado, after a valid *Miranda* warning. The district court concluded that those "two facts, taken together, remedy the coercive effect of the parole condition." While acknowledging the risk of confusion where officers rely on a parole compliance check rather than probable cause or a warrant, the district court found that "[t]he *Miranda* warning combined with the fact that Officer Coronado is not Mr. Watson's parole officer is

---

[3] On appeal, Watson does not challenge the district court's admission of the evidence seized from his vehicle.

sufficient to signal that the nature of the interaction had changed from a parole compliance check to some kind of investigation."

Subsequently, Watson entered into a plea agreement in which he agreed to plead guilty to the indictment upon the condition that he be allowed to appeal the court's denial of the motion to suppress. Following the entry of Watson's conditional plea, the district court sentenced him to 188 months in prison and five years of supervised release.

### III

The district court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

### IV

"We review *de novo* motions to suppress, and any factual findings made at the suppression hearing for clear error." *United States v. Negrete-Gonzales*, 966 F.2d 1277, 1282 (9th Cir. 1992). A finding of clear error requires "a definite and firm conviction that a mistake has been made. Thus, if the district court's findings are plausible in light of the record viewed in its entirety, the appellate court cannot reverse even if it is convinced it would have found differently." *United States v. McCarty*, 648 F.3d 820, 824 (9th Cir. 2011) (quoting *Husain v. Olympic Airways*, 316 F.3d 829, 835 (9th Cir. 2002)).

### V

### A

On appeal, Watson argues that his incriminating statements and the fruits thereof should be suppressed because his Agreement required him to cooperate and be

truthful with parole officers upon threat of revocation of parole and, as a result, he was involuntarily coerced into responding to task force questions in violation of his Fifth Amendment rights.  Watson argues that his *Miranda* warning was insufficient to negate compulsion and that the district court incorrectly emphasized that Watson's statements were made to Detective Coronado, not a parole officer.  Watson argues that because the Fourth Amendment waiver condition in his Agreement permits search by "any agent of IDOC or a law enforcement officer," he could have reasonably misunderstood that *all* of the Agreement's concessions are made to all law enforcement, not just parole officers.

Watson further contends that P&P officers were "omnipresent" throughout the search of his vehicle, his residence (his mother's home), his grandmother's home, and Detective Coronado's questioning, leading Watson to believe he had no choice but to "cooperate" or face revocation of parole.  He points to several facts: the search was characterized "early and often" to Watson as a P&P compliance search; P&P instructed Officer Scott to detain Watson and search his car; P&P Officer Nicholas—Watson's parole supervisor—spoke with Watson, took his phone, and asked for his password; P&P Officer Landers arrived on scene and spoke with Watson, asking him what "we" would find in the car and telling him, not asking, that "we" were going to search his house; no one from P&P gave Watson his *Miranda* warnings; and P&P Officer Landers is so embedded within NPD as the liaison between the P&P and the drug task force that he keeps his office there.  Watson maintains that the fact that it was Officer Coronado, rather than a P&P officer, who Mirandized and questioned him does not remedy the coercive impact of P&P's involvement,

which "muddied the water" and led Watson to believe that his Agreement required he comply with Detective Coronado's request to talk for fear of losing his liberty.

On appeal, the government argues that the district court properly denied Watson's motion to suppress because the circumstances surrounding his incriminating statements did not create a "classic penalty situation." The government argues that Watson's Agreement required truthfulness to *his probation/parole officer*, not *any* law enforcement officer, and that his post-*Miranda* incriminating statements to law enforcement occurred after the interaction had shifted from a parole compliance check to a drug investigation. Further, the government notes that Watson's Agreement stated that if he was detained by law enforcement, he agreed to tell the officer(s) he was on felony supervision and provide his parole officer's name—notably omitting any requirement to cooperate with or be truthful to law enforcement. The government argues that Watson's statements were not involuntarily compelled under penalty of revocation because Watson's P&P officer was not involved in eliciting his incriminating statements: P&P officers were not present when Detective Coronado Mirandized Watson, his statements were not made to P&P officers, and P&P officers only interacted with Watson during the traffic stop.

## B

The Fifth Amendment's privilege against self-incrimination generally applies only to those who "claim it." *Saechao*, 418 F.3d at 1077 (quotation omitted). However, this general rule does not apply when an individual is "denied the free choice to admit, to deny, or to refuse to answer." *Id.* This can occur when the government creates a situation where "an individual's refusal to answer

incriminating questions subjects him to a penalty." *Id.* In a "penalty situation," the Fifth Amendment becomes self-executing. *Murphy,* 465 U.S. at 435–36. In other words, "if the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation . . . the failure to assert the privilege would be excused, and the probationer's answer would be deemed compelled and inadmissible in a criminal prosecution." *Id.* at 435.

> In the probationary [or parole] context, this means that although the state is permitted to require a probationer to "appear and discuss matters affecting his probationary status," the probationer may not be required under threat of revocation of probation to respond to "questions put to [him], however relevant to his probationary status, [that] call for answers that would incriminate him in a pending or later criminal proceeding."

*Saechao*, 418 F.3d at 1077 (quoting *Murphy,* 465 U.S. at 435).

The Supreme Court has instructed that a "general obligation to appear and answer questions truthfully [does] not in itself convert [a defendant's] otherwise voluntary statements into compelled ones." *Murphy*, 465 U.S. at 427. For that reason, not every probation condition requiring truthfulness or cooperation creates a penalty condition. Rather,

> in order for a court to determine whether a probationer is subject to a penalty situation, it

"must inquire whether [his] probation
conditions merely required him to appear and
give testimony about matters relevant to his
probationary status or whether they went
further" by taking "the extra, impermissible
step" of requiring him "to choose between
making incriminating statements and
jeopardizing his conditional liberty by
remaining silent."

*Saechao*, 418 F.3d at 1077–78 (quoting *Murphy*, 465 U.S. at
436).

*Murphy* and *Saechao* illustrate the line between a
permissible probation/parole condition and an impermissible
penalty situation. In *Murphy*, the Supreme Court held that a
condition requiring the defendant to "be truthful with his
probation officer in all matters" did not render an otherwise
voluntary statement involuntary because it did not *require*
him to answer his probation officer's inquiries. 465 U.S. at
436–37. "On its face, Murphy's probation condition
proscribed only false statements; it said nothing about his
freedom to decline to answer particular questions[.]" *Id.* at
437. The Court concluded that Murphy could not have been
"deterred from claiming the privilege by a reasonably
perceived threat of revocation." *Id.* at 439.

In contrast, we have found a penalty situation where the
probation condition required the probationer to "promptly
and truthfully answer all reasonable inquiries" because
staying silent could result in revocation of probation.
*Saechao*, 418 F.3d at 1075. Unlike Murphy, Saechao "was
compelled by threat of penalty to answer the probation
officer's inquiry" because the terms of his probation
compelled him to truthfully answer *all* inquiries. *Id.* at 1078.

The key differentiating feature between the probation conditions in *Saechao* and *Murphy* was whether the probationer was free to remain silent without risking revocation of parole. *Murphy*'s probation condition proscribed *false* statements only, leaving him free to remain silent so long as he was truthful when he spoke. *Murphy*, 465 U.S. at 437. In contrast, Saechao's probation condition expressly penalized the refusal to answer a question—failure to answer a relevant inquiry regarding the conditions of his probation would have justified revocation of probation. *Saechao*, 418 F.3d at 1078. In other words, a probation condition requiring answers to *all* relevant inquiries implies that a defendant may not invoke his Fifth Amendment right to remain silent without facing a penalty—here, revocation of probation or parole. *See id.* at 1079.

The district court reasoned that Watson's parole condition requires more than truthfulness (as in *Murphy*) but does not explicitly require answers to all inquiries (as in *Saechao*). Seeing the three conditions side-by-side is useful:

- Murphy's condition required him to "be truthful with the probation officer 'in all matters.'" *Murphy*, 465 U.S. at 422;

- Saechao's condition required him to "promptly and truthfully answer all reasonable inquiries by the Department of Correction or County Community Correction Agencies." *Saechao*, 418 F.3d at 1075;

- Watson's condition required him to "cooperate with the requests of [his] probation/parole officer" and stipulated

that "[c]ooperation includes being truthful."

We have not yet addressed whether a condition requiring "cooperation"—as opposed to explicitly requiring *answers* to inquiries as in *Saechao*—creates an impermissible penalty situation.[4]  We do not decide that question here.  Watson's incriminating statements were made to a *law enforcement officer* and therefore could not be penalized pursuant to the Agreement.

## C

The district court held that Watson was not subject to the "classic penalty situation" because his incriminating statements were made to Detective Coronado, a law enforcement officer after he administered *Miranda* warnings.  Those two facts, the district court reasoned, distinguished Watson's case from *Saechao*.  We agree.  The district court relied on the following factors to support its decision to deny the motion to suppress:

> 1. NPD Detective Coronado adequately conveyed to Watson his *Miranda* rights;

---

[4] Watson's Agreement also did not expressly or impliedly state he would be subject to revocation of parole if he violated the conditions.  Rather, the Agreement stated that Watson understood that his failure to comply with the conditions "may result in the submission of a report of violation to [his] sentencing/paroling authority."  This language is different from *Saechao*, which provided that "failure to comply with any of the conditions was grounds for arrest, revocation of probation, or modification of conditions."  418 F.3d at 1075.  Although we need not reach this issue, the permissive language here does not clearly invoke a threat of revocation.

2.  the lack of recording or written waiver did not affect the adequacy of the *Miranda* warning;

3.  Watson's parole conditions mandated cooperation only "with requests of [his] probation/parole officer, not all law enforcement";

4.  Watson's statements were to law enforcement, not a P&P officer; and

5.  "[t]he *Miranda* warning combined with the fact that [Detective] Coronado is not Mr. Watson's parole officer [was] sufficient to signal that the nature of the interaction had changed from a parole compliance check to some kind of investigation."

Additional factors support the district court's conclusion that Watson's admissions were not involuntarily compelled. Most notably, there was no further interaction between the P&P officers and Watson after the initial traffic stop. P&P Officer Landers testified that during the search of Watson's residence, neither he nor P&P Officer Nicholas spoke to Watson or approached Officer Scott's patrol car in which Watson was detained. P&P Officer Landers stated that he did not communicate with or approach Watson because a pending investigation was ongoing, and he wanted to avoid "creat[ing] the illusion" that P&P officers were forcing Watson to make incriminating statements. P&P Officer Landers confirmed that it was his standard practice to avoid any communication with probationers/parolees after incriminating evidence is found in order to avoid coercion or the appearance thereof.

To be sure, during the vehicle stop, search, detention, and residence searches, the division of labor between P&P and other law enforcement personnel was not always clear. As the district court noted, Officer Scott told Watson he was being detained and his vehicle searched at the direction of probation and parole. P&P Officer Landers used the pronoun "we" when he told Watson, "After we're done searching your vehicle, we're going to take you back to your house and we're going to search your house." Later, Watson's interview with Detective Coronado occurred in the back of the patrol car where Watson had been initially detained for a parole compliance check. The interview occurred while officers were searching Watson's residence, ostensibly as part of that compliance check. Officer Scott, who originally told Watson he was acting pursuant to P&P's request, escorted Watson through the various stops until he arrived at the police station. Overall, and as the district court emphasized, officers "muddied the water" between the parole compliance check and the investigation of drug trafficking by conducting the vehicle and residence searches as a parole compliance check instead of obtaining a warrant based on ample probable cause.

The district court also noted that the integrated nature of this task force operation may have made it difficult for Watson to distinguish between which officers he was required to cooperate and be truthful with and which officers he had a Fifth Amendment right to refuse interrogation.[5] And, as the district court observed, any confusion Watson

---

[5] This is not to say that P&P officers need hesitate before cooperating with local law enforcement or contacting them for assistance. We acknowledge the benefits derived from such cooperation, particularly where P&P officers have reason to believe their safety may be at risk when conducting compliance checks in potentially hazardous situations.

may have had was "entirely of the government's own making." But none of this changes the critical point: Watson's Agreement penalized only his failure to respond to parole officers, and he made his incriminating statement in response to a question by a law enforcement officer, not a parole officer.

Watson also argues that he was never advised that failure to speak with law enforcement would *not* result in parole revocation. In support of this argument, Watson relies on this line in *Saechao*: "Moreover, the state did not advise him that 'it would not, [or] legally could not, revoke probation for refusing to answer questions calling for information that would incriminate in separate criminal proceedings.'" *Saechao*, 418 F.3d at 1081 (quoting *Murphy*, 465 U.S. at 438). But Watson's situation was entirely different than Saechao's. Saechao's incriminating statements (admitting he had a hunting rifle in his home, in violation of his probation agreement) were made in response to questioning *by his probation officer*—not another law enforcement officer. *Id.* at 1075; *see also id.* (noting Saechao's probation conditions required responses to probation officers). During questioning, the probation officer twice reminded Saechao that his probation conditions required him to "promptly and truthfully answer all reasonable inquiries" and that failure to comply could result in probation revocation. *Id.* at 1081. Only within this context did we note that Saechao was not specifically advised that he could "refus[e] to answer questions calling for information that would incriminate [him] in separate criminal proceedings." *Id.* at 1078 (quoting *Murphy*, 465 U.S. at 438).

Contrary to Watson's argument, there is no legal requirement for P&P officers to affirmatively inform a probationee/parolee that refusing to speak to *law*

*enforcement* would not jeopardize his probation/parole status. Nothing in Watson's Agreement stated he was required to speak, cooperate, or be truthful with law enforcement. The Agreement required only that, if detained by law enforcement, Watson would "tell the officer(s) that [he is] on felony supervision, and the name of [his] probation/parole officer." Additionally, that Watson was properly Mirandized immediately prior to his incriminating statements further undermines his argument that he was never told he could remain silent during police questioning without facing the possibility of parole revocation. Neither of the probationers in *Saechao* nor *Murphy* were "in custody" or provided their *Miranda* warnings, which informed Watson of his ability to remain silent.

Ultimately, despite the risk of confusion possible in an integrated operation like this one, the district court properly concluded that Watson's admissions were made voluntarily. Watson was never told that refusing to answer officers' questions would result in the revocation of his parole or another penalty. *Cf. Garrity v. New Jersey*, 385 U.S. 493, 494, 500 (1967) (statements obtained under explicit threat of removal from office were coerced and inadmissible). Before questioning him, Detective Coronado read Watson his *Miranda* rights and Watson stated that he understood those rights. When Detective Coronado asked if the officers would find drugs at his grandmother's house, Watson said, "Yeah, it's there." Watson then agreed to show the officers where the drugs were hidden in his grandmother's garage. Watson's statements about the drugs and the resulting seizure were thus legitimate fruits of his Mirandized interrogation by law enforcement.

\*\*\*

Watson was not subject to a penalty situation because nothing in Watson's Agreement required that he speak, cooperate, or be truthful with law enforcement; he was properly Mirandized immediately prior to his incriminating statements, stated he understood his rights, and agreed to cooperate; and he was never told that refusing to answer officers' questions would result in the revocation of his parole or any other penalty.  Because Watson's statements were not involuntarily compelled under penalty of parole revocation, the district court properly denied Watson's motion to suppress.

AFFIRMED.